Argued and submitted September 16, 2020; decision of Court of Appeals reversed, limited judgments of trial court affirmed in part and reversed in part, and case remanded to trial court for further proceedings March 25, 2021

ALLIANZ GLOBAL RISKS
US INSURANCE COMPANY
and Allianz Underwriters Insurance Company,
*Petitioners on Review,*

*v.*

ACE PROPERTY & CASUALTY
INSURANCE COMPANY,
as Successor to Aetna Insurance Company;
Certain Underwriters at Lloyd's London;
Certain London Market Insurance Companies;
General Insurance Company; and
Westport Insurance Corporation,
as Successor to Puritan Insurance Company,
*Respondents on Review,*

*and*

CON-WAY, INC.,
as Successor to Consolidated Freightways, Inc.,
*Respondent on Review,*

*and*

ALLSTATE INSURANCE COMPANY,
as Successor to Northbrook Excess and Surplus
Insurance Company, fka Northbrook
Insurance Company; et al.,
*Defendants.*

Court of Appeals
A159758 (Control)

ALLIANZ GLOBAL RISKS
US INSURANCE COMPANY
and Allianz Underwriters Insurance Company,
*Petitioners on Review,*

*v.*

ACE PROPERTY & CASUALTY
INSURANCE COMPANY,
as Successor to Aetna Insurance Company;
General Insurance Company; and

Westport Insurance Corporation,
as Successor to Puritan Insurance Company,
*Respondents on Review,*

*and*

AMERICAN HOME ASSURANCE COMPANY;
Certain Underwriters at Lloyd's London;
Certain London Market Insurance Companies;
Continental Casualty Company;
Lexington Insurance Company;
Northern Assurance Company of America,
*Respondents on Review,*

*and*

CON-WAY, INC.,
as Successor to Consolidated Freightways, Inc.,
*Respondent on Review,*

*and*

ALLSTATE INSURANCE COMPANY,
as Successor to Northbrook Excess and Surplus
Insurance Company, fka Northbrook
Insurance Company; et al.,
*Defendants.*

Court of Appeals
A159858

(CC 120404552)
(CA A159758 (Control), A159858)
(SC S067017)

483 P3d 1124

Plaintiff insurance company Allianz paid damages and defense costs for its insured, Daimler, and sought contribution under the common law and the Oregon Environmental Cleanup Assistance Act from defendants, who are historical liability insurers of Freightliner, a now-defunct corporation purchased by Daimler from intervenor Con-Way in the 1980s. The trial court entered two limited judgments, dismissing with prejudice various of plaintiff's claims against defendants ACE, Westport, General, and London, based on indemnification agreements between certain defendants and Con-Way and policy provisions that excluded coverage of "pollution" claims. The trial court also denied defendants' and Con-Way's motion for a directed verdict, in which defendants and Con-Way argued that Allianz had no claim for contribution because Daimler had never assumed Freightliner's liabilities. The Court of Appeals held that Daimler had not assumed Freightliner's contingent liabilities, that Allianz cannot seek contribution from Freightliner's historical liability insurers, and that the trial court had erred in denying motions for directed verdicts as to all defendants.

*Held*: (1) Because evidence in the record supported the jury's verdict that Daimler expressly or impliedly assumed Freightliner's liabilities, the trial court did not err in denying defendants' and Con-Way's motion for a directed verdict. (2) The issue of whether ACE, General, and Westport have a duty to defend or indemnify Freightliner against the claims here should have been decided by the trial court based on the terms of the agreements in the insurance policies and without regard to the side agreements or other extrinsic evidence. (3) The phrase "sudden, unintended[,] and unexpected" to describe pollution claims excluded from insurance coverage was ambiguous and, thus, it was error for the trial court not to interpret it for the jury.

The decision of the Court of Appeals is reversed. The limited judgments of the trial court are affirmed in part and reversed in part, and the case is remanded to the trial court for further proceedings.

On review from the Court of Appeals.*

C. Robert Steringer, Harrang Long Gary Rudnick P.C., Portland, argued the cause and filed the briefs for petitioners on review. Also on the briefs were James E. Mountain, Jr., and Erica R. Tatoian, and, on the reply brief, Margaret H. Warner and Ryan S. Smethurst, McDermott Will & Emery LLP, Washington DC.

Robert Koch, Tonkon Torp, Portland, argued the cause and filed the brief for respondent on review Con-Way, Inc. Also on the brief were Frank J. Weiss and Anna K. Sortun.

Carl E. Forsberg, Forsberg & Umlauf, P.S., Seattle, Washington, argued the cause and filed the brief for respondents on review Certain Underwriters at Lloyd's London and Certain London Market Insurance Companies. Also on the brief were Matthew S. Adams and Charles Henty, Forsberg & Umlauf, P.S., Timothy R. Volpert, Tim Volpert, P.C., Portland, and Matthew B. Anderson and William B. Seo, Mendes & Mount, LLP, New York.

Thomas M. Christ, Sussman Shank LLP, Portland, filed the brief for respondent on review General Insurance Company.

Beverly Pearman, Assistant General Counsel, Portland, and Seth H. Row, Portland, filed the brief for *amici curiae* Port of Portland and United Policyholders.

_____

\* On appeal from Multnomah County Circuit Court, Christopher J. Marshall, Judge. 297 Or App 434, 442 P3d 212 (2019).

Nadia H. Dahab, Stoll Stoll Berne Lokting & Shlachter, Portland, filed the brief in support of the petition for review and Lydia Anderson-Dana, Stoll Stoll Berne Lokting & Shlachter, filed the brief on the merits for *amicus curiae* Daimler Trucks North America LLC. Also on the brief on the merits was Steven C. Berman.

Michael E. Farnell, Parsons Farnell & Grein, LLP, Portland, filed the brief for *amicus curiae* Former Governor Ted Kulongoski.

Before Walters, Chief Justice, and Balmer, Nakamoto, Duncan, Nelson, and Garrett, Justices, and Rives Kistler, Senior Judge, Justice pro tempore.**

BALMER, J.

The decision of the Court of Appeals is reversed. The limited judgments of the trial court are affirmed in part and reversed in part, and the case is remanded to the trial court for further proceedings.

_____

** Flynn, J., did not participate in the consideration or decision of this case.

**BALMER, J.**

This case arises out of an insurance company's civil action seeking equitable and statutory contribution from other insurers for claims and defense costs that it paid on behalf of its insured. We describe the factual background of the case and the claims in general terms before addressing the legal arguments in detail. For the reasons explained below, we reverse the decision of the Court of Appeals, affirm in part and reverse in part the trial court's limited judgments, and remand to the trial court for further proceedings.

## I.  BACKGROUND AND PROCEEDINGS BELOW

Daimler-Benz AG acquired Freightliner Corporation (Freightliner) from Consolidated Freightways (now Con-Way) in 1981. As part of the transaction, it liquidated Freightliner's assets and liabilities into a subsidiary, Daimler Trucks North America LLC (Daimler). Between 1952 and 1982, Freightliner and then Daimler had engaged in business activities, primarily the manufacture of trucks, that subsequently led to several environmental remediation proceedings, including claims related to the Portland Harbor Superfund cleanup, and to some 1,500 asbestos personal injury claims. Plaintiffs Allianz Global Risk US Insurance and Allianz Underwriters Insurance Company (Allianz) insured Freightliner in 1981 and Daimler from 1981 to 1986 through a general commercial liability insurance policy. Daimler also purchased from Allianz another policy to provide coverage for future claims that might be made against Freightliner based on its past operations that were "incurred but not yet reported." By the time it filed the operative complaint in this action in 2014, Allianz had spent more than $24 million defending and paying environmental and asbestos claims against Daimler and the now-dissolved Freightliner arising from Freightliner's business operations between 1952 and 1982.

In this litigation, Allianz seeks contribution for the payments it has made and will make in the future based on those environmental and asbestos claims from insurance companies that insured Freightliner—either directly or through its parent, Con-Way—from 1976 to 1982. Those include defendants ACE Property & Casualty Insurance

Company (ACE), General Insurance Company (General), and Westport Insurance Corporation (Westport). Allianz also seeks contribution from Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (London), which had issued excess insurance policies to Freightliner from 1977 to 1981.[1] Defendant insurance companies declined to defend Daimler or pay claims under the relevant policies or to pay any contribution to Allianz for the amounts that it has paid. Daimler assigned its claims against defendants under the insurance policies to Allianz.

Allianz alleges that it is entitled to common-law equitable contribution because of the "equitable doctrine which holds that one who pays money for the benefit of another is entitled to be reimbursed." *Carolina Casualty v. Oregon Auto.*, 242 Or 407, 417, 408 P2d 198 (1965). It also relies on ORS 465.475 to 465.484, the Oregon Environmental Cleanup Assistance Act (OECAA), which provides that an "insurer that has paid all or part of an environmental claim may seek contribution from any other insurer that is liable or potentially liable to the insured and that has not entered into a good-faith settlement agreement with the insured regarding the environmental claim." ORS 465.480(4)(a).

The insurance companies' threshold defense is that they are not responsible for any payments by Allianz because the liabilities that they insured for Freightliner and Con-Way were not transferred to Daimler as part of the acquisition and dissolution of Freightliner in 1981. For that reason, they argue, they have no obligation at all to Daimler directly or in its capacity as the assignee of Freightliner's liabilities, and Allianz therefore may not recover any contribution from them.

A second line of defense for General, Westport, and ACE is that, even if Daimler did assume the liabilities of Freightliner, including the environmental and asbestos liabilities at issue here, their policies require no payment by them to Daimler (and thus no contribution payment to

---

[1] We sometimes refer to General, ACE, Westport, and the London defendants as "defendants" or "defendant insurance companies." Other insurance companies also insured Freightliner and are parties to the litigation, but their liability is not at issue in this appeal.

Allianz) because of side agreements, sometimes referred to as "fronting agreements," between themselves and Freightliner's parent, Con-Way. Under the side agreements, Con-Way agreed to indemnify the insurers for all claims, defense costs, and other expenses arising out of occurrences subject to the policies. Con-Way intervened in support of the insurers because, under the side agreements, "Con-Way ultimately will be responsible for any damages assessed against" them.

A third defense raised by the insurers is based on "qualified pollution exclusion" provisions in the policies. Policies issued by London and General excluded coverage for pollution liability unless the pollution was "sudden, unintended[,] and unexpected" (London) or was "sudden, unexpected, [and] unintentional" (General), which the parties refer to as the "London" pollution exclusion.[2] Policies issued by Westport and ACE excluded pollution coverage unless the pollution was caused by a "discharge" that was "sudden and accidental" (the "Domestic" pollution exclusion).

At trial, the jury found that Daimler had assumed the contingent liabilities of Freightliner and, thus, that the insurers could be liable to Daimler for the claims at issue here. However, based on the side agreements and other evidence admitted at trial, the jury also found that, notwithstanding the insurance policies issued by Westport, ACE, and General, those insurers and Con-Way did not intend that the insurers would have a duty to defend or indemnify Freightliner. As to the pollution exclusion provisions, the jury agreed with Allianz that the Domestic exclusion provisions in the ACE and Westport policies did *not* exclude the environmental claims at issue here, but also found that the London exclusion provisions in the London and General policies *did* exclude coverage of those environmental claims.

Based on the jury verdict, the trial court entered the two limited judgments that are at issue here. In one, the trial court declared, because the jury had found that

---

[2] The pollution exclusions in the London and General policies have the minor textual differences that appear in the quoted provisions, as well as other differences, which we discuss below. Nevertheless, as noted, the parties generally refer to them both as the "London" pollution exclusion, and we do as well.

Con-Way and the fronting insurers—General, ACE, and Westport—did not intend that those insurers would have a duty to defend Freightliner as to the claims at issue, that Allianz was not entitled to contribution from those defendants for the amounts that it paid with respect to the claims. It therefore dismissed with prejudice all of Allianz's claims against ACE and claims against General and Westport that related to some of the policies that they had issued. In the second limited judgment, the court declared that London was not required to defend Daimler and that Allianz was not entitled to contribution from it because the London pollution exclusion excluded such claims; it dismissed with prejudice the claims related to certain policies issued by London.[3]

Allianz appealed, assigning error to various trial court rulings related to the ACE, General, and Westport policies, the side agreements, and the London pollution exclusion. The thrust of its argument was that the trial court had erred in submitting to the jury issues regarding the effect of the side agreements and the interpretation of the insurance policies, which, Allianz asserted, should have been decided by the court as a matter of law. Con-Way and defendant insurance companies cross-assigned error to the trial court's denial of their motion for a directed verdict in their favor, arguing that Daimler had never assumed Freightliner's contingent liabilities in the first place and therefore was not entitled to make any claims under the policies. For that reason, Con-Way and the defendant insurance companies contended, Allianz had no viable claim for contribution.

The Court of Appeals determined that the cross-assignment of error was dispositive and, accordingly, did not address any of Allianz's assignments of error. *Allianz Global Risks v. ACE Property & Casualty Ins. Co.*, 297 Or App 434, 439, 442 P3d 212 (2019). The court held that Daimler had not assumed Freightliner's contingent liabilities, that Allianz

---

[3] The dismissal of claims against General based on the pollution exclusion verdict was included with the other declarations as to General in the first limited judgment. Also, certain other claims and counterclaims in the case were resolved by trial court rulings and settlements that are not before us. This appeal is limited to the two limited judgments entered by the trial court and the claims resolved by those judgments.

cannot seek contribution from Freightliner's historical primary and excess liability insurers, and that the trial court had erred in denying motions for directed verdicts as to all defendants. *Id.* at 445. It affirmed the limited judgments on that alternative ground. *Id.* Allianz filed a petition for review, which we allowed.

## II.   DAIMLER'S ASSUMPTION OF FREIGHTLINER'S CONTINGENT LIABILITIES

We begin with the issue that the Court of Appeals found dispositive: whether Daimler acquired Freightliner's contingent liabilities in 1981. As set out in the verdict, the jury found that Daimler was "the successor to the liabilities of Freightliner Corporation * * * by reason of * * * [e]xpress or implied assumption of all liabilities." On appeal, defendants and Con-Way argued that the trial court erred in submitting the issue to the jury because documents related to the acquisition unambiguously show that Freightliner did not transfer, and Daimler did not assume, Freightliner's contingent liabilities. The Court of Appeals accepted that argument, and for that reason held that the trial court should have granted a directed verdict. *Id.* We disagree with the Court of Appeals.

### A.   *The Daimler-Freightliner Agreements Regarding the Acquisition*

On July 31, 1981, Daimler acquired all the stock of Freightliner. Through three agreements executed on August 14, 1981, Freightliner was liquidated and certain of its assets and liabilities were transferred to the Daimler subsidiary.[4] (Freightliner was later dissolved and all of its remaining assets transferred to Daimler.) The question is whether Freightliner's contingent liabilities were transferred to Daimler in the August 14, 1981, agreements. In the "Agreement and Plan of Liquidation," Daimler "expressly assumes and agrees unconditionally to pay and discharge

---

[4] The two parties to each of the agreements are the Daimler subsidiary known as Freightliner Acquisition Corporation and Freightliner Corporation, the entity that Daimler acquired from Con-Way. To avoid confusion, we refer to Freightliner Acquisition Corporation by the name of its parent company, Daimler.

any and all liabilities and debts" of Freightliner. That document also provides that Daimler

> "shall deliver to [Freightliner] an instrument of assumption, under the terms of which [*Daimler*] *shall expressly assume* and undertake to pay, perform, fulfill and discharge *all such liabilities and obligations of [Freightliner], accrued to or existing at the time of transfer, whether absolute or contingent, and of whatever nature,* except as otherwise provided for therein."

(Emphases added.) Executed the same day was the referenced "instrument of assumption," titled the "Assumption." In the "Assumption," Daimler

> "*expressly assumes* and undertakes to pay, perform, fulfill and discharge *all liabilities and debts of* [*Freightliner*], including, without limitation, all obligations, covenants and duties under any and all leases of real and personal property, obligations under licenses of United States and foreign patents, trademarks, service marks and copyrights, dealer agreements, pension and health plans, financial and credit arrangements, contracts, indentures, mortgages, pledges, warrants, subscriptions, loan agreements, export agreements, employment agreements, insurance agreements and plans, sales and repurchase agreements, indemnity agreements and plans of composition, and *all other liabilities and obligations whether accrued, absolute or contingent,* as of the date hereof."

(Emphases added.) Daimler and Freightliner also executed a "Transfer and Assignment" at the same time, in which Freightliner

> "hereby assigns and transfers to [Daimler] \*\*\* all of the properties and assets of [Freightliner], both real and personal, tangible and intangible, of every kind and nature, and wheresoever located, except as set forth in Schedule A hereto \*\*\*[.]"

"Schedule A," attached to the "Transfer and Assignment," excludes from the transfer agreement

> "[a]ll contingent liabilities, and sufficient cash amounts as are estimated to be necessary to satisfy such liabilities, for which reserves have previously been established. This includes, but may not be limited to, reserves for warranty and insurance claims."

About two weeks later, on September 1, 1981, the parties signed a letter agreement clarifying their intent regarding Freightliner's liquidation, primarily as to the disposition of certain leases. The letter expressly excludes from the "Transfer and Assignment" a list of 31 "real and personal property leases for which the prior written consent of the lessors is required." It otherwise confirms that the "Transfer and Assignment" was "intended to transfer all properties and assets of Freightliner of every kind and nature other than the liabilities of Freightliner referred to in Schedule A and an amount of assets retained sufficient to satisfy such liabilities ***."

As noted, the factual question of whether Daimler had "express[ly] or implied[ly] assum[ed] *** all liabilities" of Freightliner, based on those agreements and other evidence presented at trial, was presented to the jury. The jury found that Daimler had assumed those liabilities.

B.  *The Court of Appeals Ruling on Defendants' Cross-Assignment of Error*

The Court of Appeals concluded otherwise. That court viewed the August 14, 1981, agreements as being "ambiguous" as to "Daimler's assumption of Freightliner's contingent liabilities."

> "The 'Agreement and Plan of Liquidation' and the 'Assumption' agreement state that Daimler assumes all liabilities, 'whether absolute or contingent, and of whatever nature,' but the 'Transfer and Assignment Agreement' explicitly states that the transfer does not include Freightliner's contingent liabilities."

*Allianz*, 297 Or App at 444. To resolve that ambiguity, the court then looked to the September 1, 1981, letter agreement, which it construed to be either part of the August 14 agreement or an addendum to the August 14 documents:

> "The letter states explicitly that its purpose is to clarify the terms of the August 14, 1981, agreement. It is signed by the parties and unequivocally and unambiguously states that Freightliner has not transferred, and Daimler has not assumed, Freightliner's contingent liabilities. Thus,

because the letter is properly viewed as part of the parties' agreement, and because the text and context of the letter resolve the issue, we do not consider extrinsic evidence of the parties' intent or maxims of construction."

*Id.* at 444-45. The court concluded that, as a matter of law, the agreement between the parties was unambiguous and that Daimler had not assumed Freightliner's contingent liabilities. *Id.* at 444. Accordingly, it held that the trial court "erred in denying the motion for a directed verdict as to all defendants" and allowing the issue to go to the jury. *Id.* at 445.

On review, Allianz argues that the Court of Appeals misinterpreted the contractual documents between Daimler and Freightliner which, when read together, are not contradictory. The transaction, Allianz maintains, was structured to allow the defunct Freightliner to retain some assets so that it could pay certain contingent liabilities after its liquidation into Daimler but before it was formally dissolved. Doing so would allow the entities to obtain favorable tax treatment on their consolidated returns over a three-year period.[5] Allianz emphasizes that under the agreement Daimler expressly assumed *all* contingent liabilities of Freightliner, although Freightliner also *remained* obligated on *some* of its liabilities; that is, both Freightliner and Daimler were responsible for that subset of liabilities. Freightliner also retained "previously established" monetary reserves that would allow it (rather than the new owner Daimler) to satisfy those liabilities, which would provide tax benefits to the consolidated entities. In Allianz's view, the documents as a whole unambiguously reflect the intent just described; but, to the extent that the August 14 agreements and the September 1 letter might be ambiguous or internally inconsistent, Allianz

---

[5] Two aspects of the August 14, 1981, agreements were based on tax considerations. First, all of the Freightliner assets, except those identified in Schedule A, were transferred to Daimler as of that date so that Daimler would have a stepped-up basis in those assets. *See* 26 USC § 334(b)(2) (1976) (providing step-up basis for assets of acquired corporation if liquidated within two years after acquisition). Second, Schedule A provided that certain contingent liabilities and assets reserved to pay those liabilities would continue to be liabilities of Freightliner, because amounts paid to satisfy those liabilities could be deducted as business expenses under 26 USC § 162(a) only if the payments were made by Freightliner. No one appears to dispute those basic aspects of tax law.

asserts, the trial court did not err in allowing the issue to go to the jury, which heard extensive evidence and unanimously agreed that Daimler had explicitly or implicitly assumed all Freightliner's liabilities.[6]

The contractual documents support Allianz's position and the jury's verdict. The text of the "Agreement and Plan of Liquidation" could hardly be clearer: Daimler "expressly assumes and agrees unconditionally to pay and discharge *any and all liabilities* and debts" of Freightliner. (Emphasis added.) It then provides that Daimler will deliver to Freightliner "an instrument of assumption" under which Daimler will "expressly assume and undertake to pay, perform, fulfill and discharge *all such liabilities and obligations* of [Freightliner], *accrued to or existing at the time of transfer, whether absolute or contingent, and of whatever nature ***.*" (Emphases added.) The unsurprisingly titled "Assumption," executed the same day, repeats the same language, again setting out Daimler's agreement to assume, pay, and discharge "all liabilities and debts" of Freightliner, listing different categories of obligations not at issue here, and "including *** *all other liabilities* and obligations *whether accrued, absolute or contingent ***.*" (Emphases added.)

The Court of Appeals perceived a conflict between the "Agreement and Plan of Liquidation" and the "Assumption," on the one hand, and the "Transfer and Assignment" on the other, because the latter "explicitly states that the transfer does not include Freightliner's contingent liabilities." *Allianz*, 297 Or App at 444. For that conclusion, the court relied on Schedule A of the "Transfer and Assignment." *See id.* at 442 ("Schedule A *** explicitly excluded from Daimler's assumption Freightliner's contingent liabilities."). To resolve that inconsistency or "ambiguity," *id.* at 444, the court looked to the September 1, 1981, letter agreement.

---

[6] Allianz asserts that the three August 14, 1981, documents and the September 1, 1981, letter unambiguously establish that Daimler assumed all liabilities of Freightliner, including those at issue here, and that the trial court therefore should have ruled in its favor as a matter of law, rather than permit the consideration of extrinsic evidence and submit the question to the jury. *See Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (in the absence of ambiguity, court construes the words of a contract as a matter of law). Because the jury found in Allianz's favor on this issue in any event, we need not address that aspect of its argument.

It concluded that the letter "eliminate[d] any ambiguity *** that Freightliner's contingent liabilities had not been transferred to Daimler" and that it "unambiguously states that Freightliner has not transferred, and Daimler has not assumed, Freightliner's contingent liabilities." *Id.* at 444-45.

To consider whether the Court of Appeals erred in holding that the contracts outlined above demonstrate that Daimler did not assume Freightliner's contingent liabilities, we take a step back and look at the agreement as a whole, as set out in the four documents. The "Agreement and Plan of Liquidation," as its name indicates, sets out the central terms of the "agreement" between Daimler and Freightliner and the "plan" for the liquidation and later dissolution of Freightliner. The other documents implement that plan. The "Agreement and Plan of Liquidation" provides that Daimler will deliver to Freightliner "an instrument of assumption" expressly assuming all of Freightliner's liabilities, "whether absolute or contingent." That instrument is the "Assumption." As discussed above, in the "Assumption," Daimler expressly assumes *all* contingent and other liabilities. Moreover, it does so explicitly "in consideration of the transfer and assignment" of all of Freightliner's assets to Daimler.

The "Agreement and Plan of Liquidation" also provides for the liquidation of Freightliner through the distribution of its assets to Daimler. Under that document, the assets of Freightliner are transferred to Daimler, beginning with a "first distribution" and ending with a final distribution not more than "three (3) years from the close of the taxable year in which the first distribution *** occurs." That step is accomplished by a third document, the "Transfer and Assignment." The "Transfer and Assignment" does exactly what its name indicates: it "assigns and transfers to [Daimler] as of the close of business on [August 14, 1981,] all the property and assets of [Freightliner], both real and personal, tangible and intangible *** except as set forth on Schedule A hereto ***." The remaining "property and assets" are to be—and were—transferred to Daimler within three years, after the consolidated entities had realized the favorable tax consequences that accrued to them because Freightliner paid certain liabilities from its remaining

assets—the "previously established" reserves—over those years.

As noted, the Court of Appeals relied on a fourth document—the September 1, 1981, letter—to conclude that Daimler had not assumed Freightliner's contingent liabilities. That document, however, had a different focus than "eliminating any ambiguity" about whether "all" contingent liabilities, including liabilities such as those at issue in this case, had been transferred to Daimler. As the text of the letter states, it was intended to

> "clarify [the parties'] mutual intent *with respect to the liquidating distribution* by [Freightliner to Daimler] effected by the *Transfer and Assignment* \* \* \* [and to] confirm that such instrument was intended to transfer *all properties and assets* \* \* \* other than the liabilities of Freightliner referred to in Schedule A and an amount of assets retained sufficient to satisfy such liabilities *and other than the following real and personal property leases* for which the prior written consent of the lessor is required."

(Emphases added.) The September 1, 1981, letter then specifies the 31 real and personal property leases to which Freightliner was a party and provides details as to the dollar amount of assets to be retained by Freightliner and the handling of intra-corporate accounting matters between Daimler and Freightliner.

We first consider and reject the Court of Appeals' determination that the September 1, 1981, letter was intended to clarify the "August 14, 1981, agreement" and that it "unequivocally and unambiguously states that Freightliner has not transferred, and Daimler has not assumed, Freightliner's contingent liabilities." *Allianz*, 297 Or App at 444-45. To the contrary, as quoted above, the letter explicitly states that it was intended to clarify the parties' intent regarding the "liquidating distribution \* \* \* *effected by the Transfer and Assignment*" of "all properties and assets"—which was only one of the August 14, 1981, documents. The document in which Daimler explicitly and without any exceptions *assumed* all of Freightliner's liabilities, contingent and otherwise, was not the "Transfer and Assignment," but the "Assumption." The September 1, 1981,

letter did not purport to clarify or modify the "Assumption" or that document's unequivocal assumption of "all liabilities and obligations whether accrued, absolute or contingent[.]" Rather, aside from repeating some of the terms of earlier documents, specifically the "Transfer and Assignment," it simply sets out the leases for which Freightliner continues to be liable because their assumption by Daimler would require "the prior written consent of the lessors." Additionally, the letter, like the "Transfer and Assignment" that it "confirm[s] and clarif[ies]," contains no legally binding obligation at all as to the assumption by Daimler of the contingent liabilities at issue in this case.

The September 1, 1981, letter and the "Transfer and Assignment" did not "effect" any assumption of liabilities by Daimler; rather, they "effected" the transfer and assignment of Freightliner's *assets* to Daimler. The assumption of liabilities was "effected" by the "Assumption."[7] The letter, like the "Transfer and Assignment," refers to the "liabilities of Freightliner referred to in Schedule A," but adds no additional legal or factual support to the arguments of Con-Way and defendants regarding the liabilities that Daimler did or did not assume.

We turn to the dispute about the meaning of Schedule A to the "Transfer and Assignment." The Court of Appeals read the "Transfer and Assignment" as "assign-[ing] to Daimler all of its assets, except for its contingent liabilities." *Id.* at 441. That interpretation misconstrues the plain meaning of the document. First, as quoted above, and consistent with its title, the document "*assigns and transfers* to [Daimler] *** all of the properties and assets of [Freightliner.]*" (Emphasis added.) A party with assets may "assign" or "transfer" those assets to another.[8] However,

---

[7] To the extent that the September 1, 1981, letter clarified or modified the Transfer and Assignment as it related to "contingent liabilities," it excepted from the transfer to Daimler only the real and personal property leases listed in the letter, for which the parties apparently had not yet secured the required approval of the lessors.

[8] *See Black's Law Dictionary* 146-47 (11th ed 2019) (defining "assign" as "[t]o convey in full; to transfer," and "assignment" as "the transfer of rights or property"). *See id.* at 1803 (defining "transfer" as "[t]o convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of ***[; t]o sell or give").

a party with obligations or liabilities ordinarily does not "assign" or "transfer" those liabilities to another party. Rather, the other party *assumes* those obligations and liabilities, just as Daimler did here in the "Assumption."[9] The "Transfer and Assignment" employs words of common and legal usage—"assign" and "transfer"—that connote a change in ownership of assets and property, but does not use the word "assumption," a word that, again, in both common and legal usage, connotes something quite different, *viz.*, the taking on by one party of another's liability or obligation.

The "Transfer and Assignment" implements the comprehensive "passing" or "handing over" from Freightliner to Daimler of "all the properties and assets of [Freightliner], both real and personal, tangible and intangible, of every kind and nature, and wheresoever located, except as set forth on Schedule A \*\*\*." Schedule A then *excludes* from that transfer of "all the properties and assets" of Freightliner a specific subset of liabilities and associated assets:

> "*All contingent liabilities*, and sufficient cash amounts as are estimated to be necessary to satisfy such liabilities, *for which reserves have previously been established*. This includes, but may not be limited to, reserves for warranty and insurance claims."

(Emphases added.) The reference to this subset of liabilities in Schedule A does not purport to alter Daimler's assumption of "all" of Freightliner's liabilities "whether accrued, absolute or contingent," as set out in the "Assumption." Rather, it is included there to describe the Freightliner *reserves* that had been set aside to pay that subset of liabilities and that would therefore be excluded from the otherwise comprehensive transfer of all Freightliner's *assets* to Daimler and remain with Freightliner.

Contrary to the Court of Appeals' holding and Con-Way's argument, the words of Schedule A do *not* unambiguously exclude "Freightliner's contingent liabilities" from the

---

[9] *See Black's Law Dictionary* at 154 (defining "assumption" as "[t]he act of taking (esp. someone else's debt or other obligation) for or on oneself; the agreement to so take \*\*\*").

liabilities that Daimler assumed. Rather, they can be read to exclude "contingent liabilities * * * for which reserves have previously been established."[10] The range of potential liabilities of a manufacturing company such as Freightliner can be broad indeed. As individuals, other corporations, and government entities assert legal claims of one kind or another, businesses often recognize and set aside reserves for the purpose of later paying claims and related legal costs. That is what Freightliner had done in the years leading up to the sale to Daimler. Some $16 million in reserves were retained by Freightliner and paid out during the three years after the transaction closed.

In sum, although the Court of Appeals agreed with Con-Way that the August 14, 1981, documents were "ambiguous" as to whether Daimler had assumed the contingent liabilities of Freightliner, it nevertheless concluded that the September 1, 1981, letter "unequivocally and unambiguously states that Freightliner has not transferred, and Daimler has not assumed, Freightliner's contingent liabilities." *Allianz*, 297 Or App at 444-45. It held that the trial court erred in not granting the defendants' motion for a directed verdict in their favor.

Under the "Agreement and Plan of Liquidation" and the "Assumption," Daimler expressly assumed all of Freightliner's liabilities, contingent and otherwise. It appears that certain leases and other specific liabilities for which Freightliner had established reserves may have been excluded from the otherwise comprehensive assumption of liabilities because required approvals from lessors had not yet been obtained or for tax purposes.[11] But, for the reasons

---

[10] Con-Way thus is incorrect in arguing that Freightliner "retained two things: all of its contingent liabilities, *and* reserves to pay those liabilities." (Emphasis added.) Rather, the wording of Schedule A makes clear that Freightliner retained (1) contingent liabilities *for which reserves had been established*, and (2) those reserves. And to the extent there might be any ambiguity in that wording in Schedule A, the jury resolved the issue in Allianz's favor.

[11] Con-Way argues that Daimler did not assume the contingent liabilities of Freightliner, because it could not have obtained the favorable tax treatment it sought unless Freightliner's contingent liabilities remained with that corporate entity. It cites *Pacific Transport Company v. C.I.R.*, 483 F2d 209 (9th Cir 1973), for the proposition that an acquiring company may not deduct amounts that it paid to satisfy liabilities of an entity that it had acquired. In that case, however, the acquiring company was denied the deduction not because it had *assumed*

set out above, we disagree with the Court of Appeals and conclude that the contractual documents do not unambiguously demonstrate that Daimler did not assume Freightliner's liability for the contingent liabilities at issue here.

## C. *Disposition*

Allianz also contends that the agreement between Freightliner and Daimler was unambiguous, arguing that the "Agreement and Plan of Liquidation" and the "Assumption" unequivocally demonstrate that Daimler did assume all of Freightliner's liabilities, contingent and otherwise. Allianz argues that, because the only reasonable interpretation of the contractual documents is that Daimler assumed all of Freightliner's contingent liabilities, the trial court erred in not granting Allianz's motion for a directed verdict on that issue.

As discussed at length above, a close reading of the three agreements executed on August 14, 1981, and the letter of September 1, 1981, provides substantial support for Allianz's position. But Con-Way is correct that some provisions of the documents arguably are in tension with others. For example, notwithstanding Daimler's blanket assumption of "all liabilities and obligations whether accrued, absolute or contingent" in the "Assumption," Schedule A can be read to exclude from the transfer to Daimler, "[a]ll contingent liabilities, and sufficient cash amounts as are estimated to be necessary to satisfy such liabilities, for which reserves have previously been established." Even if the commas setting off the adjectival phrase regarding "sufficient cash amounts" limit the scope of the liabilities that are excluded by Schedule A, that document undercuts Allianz's broad assertion that Daimler assumed *all* of Freightliner's liabilities. And the September 1, 1981, letter reiterates that excluded from the Freightliner to Daimler transfer are "the liabilities of Freightliner referred to in Schedule A and an amount of assets retained sufficient to satisfy such liabilities ***."

---

the liability, but because it was the entity that had *paid* the money to satisfy the obligation. *Id.* at 212. Here, Daimler left certain funds in the Freightliner shell that were used to pay certain Freightliner obligations. Freightliner, not Daimler, paid those obligations and took those deductions.

We have explained above why those minor tensions between different phrases in the documents do not substantially undermine Allianz's view that Daimler assumed all of Freightliner's liabilities, or at least all of its liabilities other than the 31 leases referred to in Schedule A and several specific categories of other liabilities for which Freightliner already had established reserves. Allianz has the better reading of the contractual documents as a whole. But we need not decide whether that is the *only* way to read the parties' written agreements and thus whether the trial court erred in denying Allianz's motion for a directed verdict. To the extent that the agreements contain any ambiguity as to what liabilities were assumed by Daimler, extrinsic evidence of the parties' intent was relevant to interpreting the contract. That evidence was presented to the jury, which found that Daimler had "express[ly] or implied[ly]" assumed those liabilities. Moreover, as the special verdict makes clear, the verdict also could have been based on a finding of Daimler's "implied assumption" of Freightliner's liabilities. *See Erickson v. Grande Ronde Lbr. Co.*, 162 Or 556, 568, 92 P2d 170, *reh'g den*, 162 Or 579, 94 P2d 139 (1939) (purchaser may impliedly assume debts and obligations of transferor). On review, then, the remaining and dispositive question is whether the jury's verdict that Daimler expressly or impliedly assumed all of Freightliner's liabilities must be set aside.

"This court cannot set aside a jury's verdict unless there was no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's cause of action." *Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003). We briefly summarize the evidence in the record that the parties intended that Daimler assume all of Freightliner's liabilities.

As discussed above, Con-Way argues that Schedule A of the "Transfer and Assignment" excluded "all contingent liabilities" from that which was being transferred from Freightliner to Daimler. Allianz responded with a different and much narrower interpretation of Schedule A, arguing that the "exception" there did not encompass *all* of Freightliner's liabilities, contingent or otherwise, but only those "contingent liabilities *** for which reserves have

previously been established." Evidence at trial showed that as of 1981 Freightliner had established five different reserve funds for contingent liabilities: "warranty expense," "Department of Transportation recall expense," "policy adjustment expense," "self-insurance expense for product liabilities," and "vacation/holiday pay." Freightliner had established no reserves for environmental or asbestos claims. The jury's verdict that Daimler assumed the liabilities of Freightliner at issue here is consistent with that evidence.

Evidence at trial also showed that the specific environmental remediation and asbestos claims for which Allianz seeks contribution were unknown and unanticipated in 1981. The first asbestos lawsuit against Daimler was filed in 1994, and its potential liability for the three environmental remediation proceedings was not known until 1983, 1991, and 2000, respectively. Based on evidence that the claims at issue here were not known at the time of Daimler's acquisition of Freightliner in 1981, the jury could have found that the parties did not intend to exclude those unknown and contingent claims as part of the liabilities "for which reserves had previously been established" in Schedule A, but rather that they were included as part of Daimler's unqualified assumption of "all * * * liabilities and obligations of [Freightliner], accrued to or existing at the time of transfer, whether absolute or contingent, and of whatever nature * * *."

The jury also heard evidence that, in the years after 1981, Daimler never disputed its responsibility for Freightliner's liabilities, including liabilities that had not been identified or known at the time of the acquisition. Former Daimler executives and a corporate tax expert testified that Daimler (or its insurers) had paid and continue to pay all of Freightliner's liabilities and obligations based on its pre-1981 operations. Evidence of such subsequent conduct is admissible to determine whether one party has impliedly assumed the debts of another. *Erickson*, 162 Or at 569. Based on that evidence, a jury could find that Daimler impliedly assumed the liabilities of Freightliner at issue here.

Because evidence in the record supported the jury's verdict that Daimler expressly or impliedly assumed Freightliner's liabilities, the trial court did not err in denying defendants' and Con-Way's motion for a directed verdict in favor of defendants.

## III.   THE INSURANCE POLICIES AND THE SIDE AGREEMENTS

Because the Court of Appeals ruled in favor of Con-Way and defendant insurance companies on their cross-assignment of error, it did not reach Allianz's challenges to the limited judgments entered by the trial court. Con-Way and defendants made a contingent request that, if we were to reverse the Court of Appeals, we remand the case to that court to consider Allianz's assignments of error in the first instance. We decline to do so. Most of the issues were extensively litigated at trial, are well-briefed on appeal, and a decision from this court will expedite further proceedings in the trial court and the ultimate resolution of the case.

Allianz challenges the jury's verdict that Con-Way and ACE, General, and Westport did not "intend" that those insurance companies, despite the policies they issued to Freightliner, "would have a duty to defend or indemnify Freightliner" against the environmental and asbestos claims at issue here. As discussed above, the centerpiece of defendants' position is that the side agreements between the insurance companies and Con-Way eliminated any obligation on the part of the insurance companies under the policies. Allianz argues, first, that the question should not have been submitted to the jury because insurance policies are interpreted by the court as a matter of law, *Hoffman Construction Co. v. Fred S. James & Co.,* 313 Or 464, 469, 836 P2d 703 (1992), and, second, that any ambiguities in the interpretation of an insurance policy are resolved in favor of coverage, also as a matter of law, *North Pacific Ins. Co. v. Hamilton*, 332 Or 20, 25, 22 P3d 793 (2001). For those and other reasons discussed below, Allianz asserts that the trial court erred in not granting its motion for a directed verdict to the effect that the insurers had "duties to defend, all environmental and all asbestos case claims at issue" according

to the terms of the policies they had issued.[12] Alternatively, Allianz argues that errors in jury instructions given and not given, evidentiary rulings, the verdict form, and the denial of its post-trial motion to set aside the jury verdict require the reversal of the limited judgment declaring that the defendant insurers had no duty to defend or indemnify Con-Way.

Con-Way and defendants counter that the trial court did not require the jury to interpret the policies themselves, but only the side contracts or "fronting agreements," and that parties to an insurance policy are permitted to negotiate such agreements about coverage. They argue that *Hoffman* stands for the proposition that, even in the insurance context, "'[t]he primary and governing rule of the construction of insurance contracts is to ascertain the intention of the parties,'" 313 Or at 469 (alteration in original), and that Allianz's suggestion that the side agreements be disregarded is inconsistent with accepted principles of contract interpretation.[13]

A.   *The Trial Court's Submission of the "Policies" to the Jury*

We first consider the threshold issue of whether the trial court erred in submitting to the jury the following question: "Did Con-Way and [the insurers] intend that [the insurers] would have a duty to defend or indemnify Freightliner against the claims at issue?" We conclude that the trial court erred.

In this case, Allianz alleged that, in the insurance policies that they issued, the insurers promised to defend and indemnify Freightliner against the claims at issue. When we consider whether an insurer has a duty under a policy to defend a lawsuit brought against its insured, we look at only the insurance policy and the complaint that the

---

[12] Con-Way and General argue that plaintiffs failed properly to assign error in their Court of Appeals' brief to the trial court rulings regarding the insurance policies and related agreements. We have reviewed those arguments and conclude that plaintiffs sufficiently preserved their objections in the trial court and identified their assignments of error in the Court of Appeals for us to consider them.

[13] In a related argument, the parties dispute the effect of "endorsements" to the ACE and Westport policies. We discuss that argument below.

insurer is being asked to defend. *Ledford v. Gutoski*, 319 Or 397, 399, 877 P2d 80 (1994). Oregon's longstanding statutes and case law make it clear that the interpretation of insurance policies is a question of law to be decided by the court. The Insurance Code provides: "[E]very contract of insurance shall be construed according to the terms and conditions of the policy." ORS 742.016(1). And "policy" is defined as "the *written* contract or *written* agreement for effecting insurance * * * and includes all clauses, riders, indorsements and papers *which are a part thereof*." ORS 731.122 (emphases added). This court's cases are consistent with those statutes. *See, e.g.*, *St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 192, 923 P2d 1200 (1996) ("The interpretation of the terms of an insurance policy is a question of law."). The court is to consider the plain meaning of the relevant policy terms; if a term is ambiguous, the court considers the context in which the term appears and then the context of the policy as a whole; if ambiguity remains, the term is construed against the drafter—here, the insurer. *McCormick & Baxter Creosoting*, 324 Or at 192; *Hoffman*, 313 Or at 469-71.

Because ORS 742.016(1) and our cases treat the interpretation of insurance policies as legal questions, decided based on the "terms and conditions of the policy," our approach is sometimes referred to as a "four-corners" rule, excluding the consideration of evidence outside the "four corners" of the policy itself. *See West Hills Development Co. v. Chartis Claims*, 360 Or 650, 653, 385 P3d 1053 (2016). Similarly, our determination of whether an insurer has a duty to defend a particular claim depends on the allegations in the complaint. If "the allegations in the complaint assert a claim covered by the policy, then the insurer has a duty to defend." *Id.* By "limiting the analysis to the complaint and the insurance policy," we generally do not consider extrinsic evidence, an approach sometimes called the "eight-corners" rule. *Id.*

The insurance policies issued here are primary, standard-form general liability policies, each providing coverage, with a $1,000,000 limit, for claims for bodily injury or property damages against Freightliner, including defense costs. The premise underlying Con-Way's and the insurers'

position that the insurance issues were properly submitted to the jury is that the jury was *not* asked to "interpret the policies," but rather, as General puts it, to "interpret *** the 'fronting agreement' that accompanied the policies."[14] But that characterization is incomplete at best. The headings of the three questions on this issue that were submitted to the jury explicitly stated that the questions were about insurance policies: "General *Policies*," "ACE P&C *Policy*," and "Westport *Policy*." (Emphases added.)[15] And the jury instructions—many of which Allianz objected to because they went beyond the terms of the insurance policies themselves—demonstrate that the jury was being asked to interpret the terms of the insurance policies as part of the overall "agreement" between Con-Way and each insurer. Instruction 21, for example, told the jury that, when "determining the intent of ACE P&C and Con-Way," the jury must consider the "terms of the January 24, 1975[,] agreement [(the side agreement)] and of the insurance policy issued by ACE P&C," as well as the "situation of [the parties] at the time they agreed to the agreement," "[s]tatements [the parties] made, and things they did, that related to the agreement," and other evidence that is plainly outside the four corners of the policy. And, of course, the side agreements themselves have no relevance or context other than in connection with the insurance policies.

The jury thus was asked to consider the policies themselves, the side agreements, the statements and conduct of the parties, and other evidence to answer the question whether the parties "intend[ed]" that the insurers "would have a duty to defend or indemnify Freightliner against the claims at issue." Allianz repeatedly objected to the trial court's decision to involve the jury in deciding the meaning

[14] Although Con-Way and the insurance companies refer to the agreements as "fronting agreements," the ACE and Westport agreements are each titled "Indemnification Agreement," and the General agreement is titled "Agreement." We generally refer to them as "side agreements," but nothing turns on the particular nomenclature.

[15] Con-Way argues that Allianz failed to object to the word "policies" being used in the headings of the verdict questions. But Allianz objected to the submission of the questions to the jury in the first place and to the related jury instructions. We refer to the headings simply to indicate that the trial judge and the parties all understood that the questions turned, at least in part, on the insurance policies.

of the insurance policies. It filed a motion *in limine* to exclude extrinsic evidence as to the interpretation of the policies, moved for a directed verdict and a peremptory instruction on that issue, and objected to instructions requiring the jury to consider extrinsic evidence. It based its arguments on the statutes and cases discussed above, and also on the fact that its contribution claims against the insurers turn entirely on their obligations under the insurance policies that they had issued to Freightliner, Con-Way, or both—and not on the side agreements that Con-Way had made with the insurers. Allianz asserts that its claims against the insurance companies "turn on whether their policies cover the underlying claims against Daimler, not whether [the insurance companies] have indemnity rights against Con-Way under the side agreements if plaintiffs prevail."

We agree with Allianz that the trial court erred in asking the jury to interpret the insurance policies. What the policies did or did not mean—that is, the correct legal interpretation of the policies—is an issue for the court to decide as a matter of law. The question whether the insurer is required to defend against particular claims depends on the policy and allegations in the complaint asserting the claims—the "four-corners" and "eight-corners" rules discussed above. The question of whether an insurer must pay or indemnify its insured for particular claims is a question of fact for the jury, if the facts are disputed, and depends on whether the circumstances established the insured's liability.

Con-Way seeks to distinguish our past decisions regarding the interpretation of insurance policies, but we find none of its arguments persuasive. It first argues that even cases involving the interpretation of insurance policies, such as *Hoffman*, ultimately turn on the parties' intent. However, *Hoffman* itself declares that "[w]e determine the intention of the parties *based on the terms and conditions of the insurance policy*." 313 Or at 469 (emphasis added). Contrary to Con-Way's implication, nothing in *Hoffman* suggests that extrinsic evidence of the parties' conduct or other side agreements is appropriate to consider in determining the *intent* of parties as to the obligations set

out in an insurance policy. That is a question of law for the court.[16]

Con-Way also argues that Oregon's rules for interpreting insurance policies apply only to "form" insurance policies, and the side agreements were negotiated contracts, not "form" insurance policies. That ignores the undisputed fact that the actual insurance policies that were issued by General, ACE, and Westport *are* standard-form primary general liability policies approved for use by Oregon insurance regulators. Although the jury also was asked to consider other evidence, including the side agreements, in determining whether Con-Way and the insurance companies had agreed that the insurance companies would "have a duty to defend or indemnify" Freightliner, that determination necessarily required the jury to interpret the terms of the insurance policies, contrary to well-established Oregon law. And while, as between Con-Way and the insurance companies, the side agreements are plainly intended to require Con-Way to indemnify the insurance companies for claims those companies paid to injured parties and attorney fees incurred in defending those claims, those terms do not modify the obligations set out in the policies themselves and, thus, are irrelevant in this inter-insurer contribution case.

Con-Way argues that the side agreements substantially altered the allocation of risk between it and the insurers, that Con-Way's agreement to indemnify the insurers for claims payments and litigation costs severely limited the insurers' liability, and that, as result, the premiums that it paid for the policies were "nominal." That is all undoubtedly true. Although Allianz argues at some points that side agreements are illegal, the record and multiple outside sources make it plain that agreements like those here are a common practice and that they can serve legitimate business purposes for both the insured and insurer.

---

[16] Oregon statutes reinforce that longstanding rule. To repeat, insurance policies "shall be construed according to [their] terms and conditions," ORS 742.016(1), which are found in "the *written* contract or *written* agreement for or effecting insurance *** and includes all clauses, riders, indorsements and papers *which are a part thereof*[.]" ORS 731.122 (emphases added). However one characterizes the side agreements, they are not "clauses, riders, indorsements [or] papers" that are "a part" of the policy.

But the complaint in this case is based on the *policies* themselves and the insurers' obligations under them. In these circumstances, the trial court's fusion of the two different agreements—a standard form insurance policy and a negotiated side agreement—and the resulting submission to the jury of the single, overarching question based on both documents whether the parties "intend[ed]" that the insurer would "have a duty to defend and indemnify" the insured was error.

If the case before us were a dispute between Con-Way and the insurance companies over the meaning of the side agreements, then the terms and business purposes of those agreements and, perhaps, extrinsic evidence of the parties' intent in entering into them, would be relevant. And the terms of the insurance policies also would likely be considered in such a dispute, although, even in those circumstances, our case law and statutes regarding insurance policies indicate that the policy terms would be construed by the court as a matter of law. But that is not the case before us. For the reasons discussed above, the interpretation of the insurance policies at issue here to determine whether the *insurers* had a "duty to defend or indemnify Freightliner against the claims at issue" should not have been submitted to the jury.

B. *Plaintiffs' Contribution Claim and the Role of the Side Agreements*

The complaint in this case is by an insurer that has paid claims and attorney fees on behalf of its insured, Daimler, and now seeks contribution from other insurers of Daimler's predecessor, Freightliner, whose contingent liabilities Daimler assumed. Equitable contribution claims by one insurer against co-insurers are not uncommon, and this court has recognized them for many years. In *Carolina Casualty*, we emphasized that the right to such contribution arises "out of the equitable doctrine which holds that one who pays money for the benefit of another is entitled to be reimbursed," and not as a result of contractual "subrogation." 242 Or at 417. And, as discussed below, that traditional equitable remedy has been supplemented in Oregon by the OECAA.

1.  The Common-Law Contribution Claim

The Court of Appeals addressed a similar co-insurer contribution issue in *Certain Underwriters v. Mass. Bonding and Ins. Co.*, 235 Or App 99, 230 P3d 103, *rev den*, 349 Or 173 (2010), *adh'd to as modified on recons*, 245 Or App 101, 260 P3d 830 (2011). There, an insurer sought contribution from co-insurers that had entered into a settlement agreement with the insured that released them from the insured's claims. The co-insurers argued that the release that was part of their settlement agreement with the insured barred the contribution claim. The Court of Appeals rejected that claim, holding that "the right to equitable contribution among insurers is not based on a subrogation or contract theory, whereby an insurer stands in the shoes of its insured. Rather, the right is grounded in principles of equity and is a right that *inures to the benefit of the insurer*"—not the insured. 235 Or App at 113 (emphasis added). We find the Court of Appeals' reasoning in *Mass. Bonding* persuasive. For the same reason that the settlement agreement in that case did not bar the plaintiff insurance company's contribution claim based on the common obligation it shared with the settling insurers of the same insured, *id.*, the side agreements here do not bar Allianz's claim against the defendant insurance companies.

Con-Way argues that *Mass. Bonding* is distinguishable because, there, the court held only that the settlement agreements did not prevent the settling insurers from having to contribute to defense costs incurred *before* they settled and, in fact, declined to express an opinion as to the co-insurers' contribution liability for defense costs incurred after the settlement. *Id.* at 116 n 8. But Con-Way does not explain why the equitable doctrine of co-insurer contribution—which, after all, is based on the terms of the insurance policies that establish common obligations of different insurers for covered claims against the same insured—should depend on the timing of any side agreement. Rather, Con-Way tries to contrast its indemnification agreements with the settlement agreements in *Mass. Bonding* that included releases of the insurance companies by their insureds by suggesting that, in its agreements, "the

duty to defend was released even before it was incurred." Con-Way asserts that none of the insurance companies can be liable to Allianz because they never had any obligation to Freightliner in the first place—essentially arguing that the "insurance policies" were meaningless because, under the side agreements, Freightliner had agreed to indemnify the insurers against all liability for claims made under the policies.

But that argument proves too much. If the insurance policies included no "duty to defend or indemnify" at all, a co-insurer could never recover contribution from other insurers. Here, however, the insurance policies themselves *do* include a duty to defend and a duty to indemnify for covered claims, even though Freightliner separately agreed to indemnify each insurer for damages and defense costs that it might incur under the policies it issued. A court sitting in equity and considering an inter-insurer contribution claim will be guided by the goal of preventing unjust enrichment. It will thus be required to consider damages and settlement amounts that a defendant insurer has paid or is obligated to pay to its insured or to claimants under the policy. And if, under a side agreement, the *insured* has repaid or agreed to repay its insurance company for claims or defense costs, those amounts will be considered in determining the extent of any required contribution from co-insurers.[17] But an insurance company that issues a policy that, by its terms, covers a particular claim cannot simply walk away from an injured third party—or a co-insurer seeking contribution— and claim that, because of a private side agreement with its insured, it has no obligation whatsoever because its "duty to defend was released even before it was incurred."

Neither party has cited a case that is directly on point regarding the effect of an insured/insurer side agreement on a co-insurer's contribution claim against the insurer, but several cases from other jurisdictions strongly suggest

---

[17] The OECAA addresses the issue of settlements by a "liable or potentially liable" insurer by providing that an insurer that has paid an environmental claim may not seek contribution from another insurer that has "entered into a good-faith settlement agreement with the insured regarding the environmental claim." ORS 465.480(4)(a). None of the insurers or Con-Way argue that they have entered into good-faith settlement agreements regarding these claims.

that a side agreement in which an insured party agrees to indemnify its insurer does not, standing alone, bar a contribution claim by a co-insurer that has paid claims for or to its insured for the same covered obligations. In *Continental Cas. v. National Union Fire Ins. Co.,* 812 F3d 1147, 1150 (8th Cir 2016), the insurer against whom contribution was being sought argued that it was not liable for contribution because, under a side agreement, the insured had agreed to indemnify it for all claims and, therefore, it had no "duty to defend" the insured. The Eighth Circuit rejected that defense, holding that,

> "although [the insured] was ultimately financially responsible for certain defense costs under its agreements with [the insurer], it did not have to pay for its defense in the first instance. Rather, in different ways, various agreements obliged [the insured] to indemnify, reimburse, or advance money to [the insurer] *** which, by implication, actually paid for the defense. By the terms of the agreements, the basic arrangement was that [the insurer] would pay the expenses and [the insured] would pay [the insurer]. Far from being free from any obligation to pay for [the insured's] defense, *** [the insurer] was on the hook unless and until [the insured] performed or [the insurer] exercised its rights."

812 F3d at 1150-51 (footnote omitted). The court affirmed the trial court's summary judgment requiring the insurance company to contribute to the damages and defense costs paid by a co-insurer: the defendant insurer "had a duty to defend [its insured] and therefore ha[d] an equitable obligation to contribute to paying the costs of the defense"; the insured's separate "agreement to pay" the insurer's costs did not defeat the co-insurer's "right to contribution." *Id.* at 1153. Rather, the court stated, "Th[ose] are distinct obligations." *Id.*

Similarly, the terms of the insurance policies at issue here made the defendant insurance companies responsible for claims covered by the policies, for the benefit of claimants and of Freightliner. Although Freightliner agreed to indemnify the insurance companies for expenses they incurred under the policies, the insurance companies were "on the hook unless and until [Freightliner] performed."

Other cases emphasize the critical role of equitable contribution in ensuring that liability is appropriately shared when multiple insurance policies cover the same claims. As the California Court of Appeal has stated:

> "[T]he right to equitable contribution exists *independently* of the rights of the insured. It is predicated on the common sense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor."

*Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal App 4th 1279, 1295, 77 Cal Rptr 2d 296, 304-05 (1998) (emphasis in original). In a dispute over multi-insurer coverage in an environmental clean-up case, Judge Posner identified the problem with allowing an insurer and its insured to disclaim liability for contribution:

> "The right is not the insured's to disclaim. It is a right of other insurers, who are not parties to the insurance policy, and it is a right founded not on the concept of third-party beneficiaries of contracts and hence not on 'the wishes of the insured' but rather on notions of equity and unjust enrichment."

*Rhone-Poulenc Inc. v. International Ins. Co.*, 71 F3d 1299, 1305 (7th Cir 1995) (citing Illinois cases). Here, too, "notions of equity and unjust enrichment" bar the defendant insurers from using side agreements with their insured to disclaim, in a contribution action by another insurer, liabilities covered by the policies that they issued.

2.    Contribution Under the OECAA

Allianz's contribution claim against the defendant insurers also relies on the OECAA. As *amicus curiae* former Governor Kulongoski points out, the OECAA "was enacted to assure the prompt availability of insurance proceeds due and owing" from the insurance companies whose insureds "'face potential liability for their ownership of or roles at

polluted sites in this state.'" (Quoting ORS 465.478.) The statute does so, *amicus* Kulongoski explains, "by prescribing rules of construction, imposing consequences for delay and obfuscation, and rewarding performing insurers by vesting them with contribution rights against nonperforming insurers."

The two key provisions of that statute that are at issue here are an "all sums" provision that makes all insurers liable for claims that come within the terms of their policies, regardless of other insurance that may be available, and a statutory contribution right for an insurer that has paid covered claims to seek recovery from other "liable or potentially liable" insurers. The "all sums" provision, ORS 465.480(3)(a), states:

> "*An insurer with a duty to pay defense or indemnity costs* or both, to an insured for an environmental claim under a general liability insurance policy that provides that the insurer *has a duty to pay all sums arising out of a risk covered by the policy*, must pay all defense or indemnity costs, or both, proximately arising out of the risk pursuant to the applicable terms of the policy, including its limit of liability, *independent and unaffected by other insurance that may provide coverage for the same claim.*"

(Emphases added.) *Amicus* Kulongoski describes that provision as "transfer[ring] the risk of an intransigent insurer from the insured to its other insurers, where it is more easily and more fairly borne." But the potential sweep of the "all sums" provision is offset by an insurer's right to seek contribution from other insurers:

> "An insurer that has paid all or part of an environmental claim may seek contribution from *any other insurer that is liable or potentially liable* to the insured and that has not entered into a good-faith settlement agreement with the insured regarding the environmental claim."

ORS 465.480(4)(a) (emphasis added).

Here, Allianz paid environmental claims on behalf of Daimler, including contingent claims against Freightliner that Daimler had assumed when it acquired Freightliner, and it now seeks contribution from Freightliner's co-insurers

during the time of the business operations that gave rise to those claims. Under the OECAA, an insurer that has paid environmental claims may seek contribution from other co-insurers, unless the co-insurers have entered into good-faith settlement agreements with their insured (which has not happened here). And each insurer's obligations are tied directly to "applicable terms of the policy," including those in "general liability polic[ies]." ORS 465.480(3)(a). The OECAA is thus consistent with our longstanding recognition of common-law inter-insurer contribution claims, *see Carolina Casualty*, 242 Or at 417, as well as our decisions interpreting insurance policies as a matter of law according to their "applicable terms," *see Hoffman*, 313 Or at 469 (intention of parties to an insurance policy determined by policy's "terms and conditions").

The existence of side agreements, indemnification promises, or an insured's waiver of policy terms is simply irrelevant to the contribution rights set out in the OECAA. Under that statute, as under our coverage cases, *see Ledford*, 319 Or at 399-400, whether an insurance company has a "duty to defend or indemnify" its insured depends on two documents: the insurance policy and the complaint. Here, whether defendant insurers had a duty to defend or indemnify Freightliner under their policies—and therefore are "liable or potentially liable" for contribution to Allianz on the environmental claims—are questions of law for the court, and they turn solely on the terms of the applicable insurance policies and the complaints that raise the environmental claims at issue.

### 3. The Statutory Context of Insurance Regulations

Finally, Con-Way's position is contrary to the state and federal regulatory structures surrounding insurance and businesses that are required by law to purchase insurance. Con-Way states that the policies that it purchased from the insurance companies, when taken together with the side indemnification agreements, were simply a means of "self-insurance," and that the insurer's "duty to defend was released even before it was incurred." But that view of the insurance policies as strictly private business transactions between Con-Way and the insurers is divorced from

the regulatory and legal world in which the transaction took place.[18] Freightliner could not have lawfully operated its business of building and transporting trucks without meeting specific federal and state legal requirements, including maintaining insurance or other security acceptable to the regulatory authorities. *See* 49 USC § 13906 (2018); *former* 49 USC § 315 (1970); *former* 49 USC § 10927 (1994); ORS 825.160 (2019) (all requiring demonstration of financial responsibility for motor carriers operating on public highways). Those regulatory requirements exist to ensure that the public will be protected against injury or damage caused by Con-Way's and Freightliner's business activities, even if the businesses dissolve or become bankrupt. State and federal law ensures that protection by requiring businesses to buy insurance to cover harms that arise from their activities.

Con-Way had no legal authority to "self-insure" or to act as an insurer under Oregon or federal law. State and federal law instead required it to purchase and maintain insurance from insurers authorized to do business in Oregon. It met those statutory obligations by purchasing the policies at issue here, those policies were required to—and did—have provisions approved by Oregon regulators, and under Oregon law they must be interpreted and applied in accordance with those terms. The side agreements between Con-Way and its insurers do not alter the insurers' duties, as set out in the policies, to defend or pay for claims covered by those policies or the statutory or equitable contribution claims of other insurers, such as plaintiff, that have paid damages or defense costs for such claims.

Because the "Limited Judgment as to Fronting Insurers and Intervenor Con-Way, Inc." was based on a jury verdict that incorrectly asked the jury to interpret insurance policies that should have been interpreted by the trial court, it must be set aside.

---

[18] We do not mean to suggest that a separate side agreement between an insured and an insurer never may affect the rights of third parties under an insurance policy. Here, however, where the insurance policies were purchased to meet federal and state legal requirements and protect the public, the insurer's agreement to indemnify the insurer against any potential liability or responsibility set out in the policy may not be interposed to prevent injured parties from seeking to recover under the policy.

C.   *The "Endorsement" Issue in the ACE and Westport Policies*

Before the Court of Appeals and this court, Allianz challenged the trial court's rulings regarding certain "endorsements" to the ACE and Westport policies that limited their liability under those policies. As with the side agreements, Allianz asserts that the legal effect of the endorsements should have been decided by the court as a matter of law, rather than being presented to the jury as part of questions 6 and 7 in the verdict form. It argued that the jury instructions on the endorsement issue, the denial of its motion for a directed verdict, and the denial of its post-trial motion to set aside the verdict constituted reversible error.

In contrast to the dispute over the side agreements, however, no party appears to argue that the endorsements were not part of the policies. *See* ORS 731.122 ("policy" for purposes of the Insurance Code "includes all clauses, riders, indorsements and papers which are a part thereof \* \* \*").[19] For the reasons discussed above, we agree with Allianz that the meaning of the disputed "endorsements," as part of the ACE and Westport policies, should have been decided by the trial court, rather than by the jury. For that reason, as well, the "Limited Judgment as to Fronting Insurers and Con-Way, Inc." must be set aside.

D.   *Proceedings on Remand*

We have held that the trial court erred in submitting to the jury the questions of whether ACE, General, and Westport have a duty to defend or indemnify Freightliner against the environmental remediation and asbestos claims that are the subject of this case. That issue should be decided by the trial court based on the terms in the insurance policies and without regard to the side agreements or other extrinsic evidence.

In some cases when this court has vacated a trial court judgment—including some insurance contribution cases—we have simply determined the judgment that should have been entered, *see, e.g.*, *Carolina Casualty*, 242

---

[19] And no party argues that "endorsement" has a different meaning than "indorsement."

Or at 418. Here, the complexity of the record regarding the insurance policies, the different time periods covered by the policies, differences in the wording of some of the policies, and similar potentially important details preclude us from accurately determining the nature of the appropriate judgment. On remand, the trial court should conduct further proceedings consistent with this opinion before entering a judgment on plaintiffs' claims for equitable contribution and for contribution under the OECAA.

As to the interpretation of the endorsements to the ACE and Westport policies, we also hold that the trial court erred in submitting the issue to the jury. In contrast to the side agreements, however, the endorsements are part of the insurance policies, and, on remand, their meaning should be decided by the court as part of interpreting the policies.

## IV.   THE POLLUTION EXCLUSIONS

The final issue we must resolve involves the "qualified pollution exclusion" clauses found in certain of Freightliner's insurance policies. As with Allianz's challenge to the trial court rulings regarding the effect of the side agreements, the Court of Appeals did not reach this issue, and Con-Way and defendants request that we remand for the Court of Appeals to consider it in the first instance. We decline to do so for the reasons previously described.

### A.   *Background of the Pollution Exclusion Issue*

The insurance policies contained versions of a qualified pollution exclusion providing that those policies did not cover bodily injury or property damage resulting from pollution.[20] Those provisions, however, each contained an exception that described categories of pollution or circumstances to which the *exclusion* did *not* apply (hence the description of the exclusions as "qualified") and where the policy thus would provide coverage. As relevant on review and described earlier, there are two primary variations of the qualified

---

[20] The exclusions themselves refer to the "discharge" of matter onto land or into air or a body of water, with some variations in the degree of specificity with which that "discharge" is described. The parties appear to agree, however, that these exclusions were generally directed at "pollution," and so we use that term as shorthand.

pollution exclusion—the Domestic exclusion, which appears in the ACE and Westport policies, and the London exclusion, which is in the London and General policies. The Domestic version excepts from the pollution exclusion—and thus provides insurance coverage for—claims arising out of a discharge of pollutants that is "sudden and accidental."[21] The London version excepts from the pollution exclusion—and thus provides insurance coverage for—claims arising from pollution that results from a "happening" that is "sudden, unintended[,] and unexpected."[22]

The two different pollution exclusions were the subject of extensive and repeated discussion among the parties and the trial court, including various trial motions and disputes over the verdict form and the jury instructions. The positions of the parties, however, were generally consistent throughout the trial proceedings.[23] Allianz viewed the Domestic and London exclusion clauses as having the same legal effect. It relied on this court's decision in *McCormick & Baxter Creosoting*, 324 Or 184, to argue that the different pollution exclusions should be interpreted as a matter of law

---

[21] The exception in the ACE and Westport policies provides: "* * * this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental[.]"

[22] The parties and the trial court considered the ACE and Westport policies, which had the Domestic exclusion, together and gave one jury instruction that covered both of those policies. The variations between the exclusions in those policies appear to be negligible. The parties and the trial court also considered the London and General policies together and gave two separate but virtually identical jury instruction as to those policies. Although the parties did not appear to differentiate between the exclusions in the London and General policies at trial, referring to them both as having "London exclusions," the policies issued by the London defendants provide that the exclusion does not apply "where such seepage, pollution or contamination is caused by a sudden, unintended[,] and unexpected *happening*." (Emphasis added.) The exclusion in the General policies does not apply "if the discharge is sudden, unexpected, [and] unintentional." We express no opinion as to the effect, if any, of those differences in the terms of the London and General policies. Rather, our decision in this case concerns the narrow question of construing the two phrases "sudden and accidental" and "sudden, unintended[,] and unexpected."

[23] Con-Way and the defendant insurers raise various preservation objections regarding Allianz's challenges to the trial court rulings on the pollution exclusion issue. Some of Allianz's arguments at trial and assignments of error on appeal could have been more clearly presented, but there is little doubt that the parties and the trial court understood the central disputes between the parties. Allianz's assignments of error are sufficiently raised and developed for this court to address them.

to provide insurance coverage for the kind of environmental pollution at issue here. In that case, which we describe in greater detail below, we interpreted the term "sudden and accidental" in a pollution exclusion provision to mean "unintended and unexpected"—that is, *not* to have the "temporal meaning" that is often associated with the word "sudden." *Id.* at 215-16. Allianz argued that the "sudden and accidental" wording in the Domestic exclusion and the term "sudden, unintended[,] and unexpected" in the London exclusion should be interpreted similarly as not having a temporal element.

Defendants responded that neither the exceptions for "sudden and accidental" or "sudden, unintended[,] and unexpected" pollution applied to the kind of gradual, long-term environmental contamination that Allianz alleged in the complaint. They argued for a narrow reading of *McCormick & Baxter Creosoting* as applied to the Domestic exclusion and against its extension to the London exclusion.[24] Defendants' proposed instructions for both versions of the exclusions included the following sentence: "In this respect, sudden means short in time or duration, or quick."

The trial court gave separate instructions on the Domestic and London exclusions. As to the Domestic exclusion in the ACE and Westport policies, the instruction described the pollution exclusion and the exception to the exclusion for the discharge of pollutants that is "sudden and accidental." Following *McCormick & Baxter Creosoting*, the court then provided the interpretation of that policy term that the jury was to use: "In this respect, sudden and accidental means unexpected and unintended." In describing the London exclusion in the London and General instructions, the trial court also described the pollution exclusion and quoted the exception to the exclusion in the policy providing that there would be insurance coverage if the discharges were "sudden, unintended[,] and unexpected."[25] The final instruction

---

[24] Defendants' proposed instructions on the London and General policies were separate, but used similar language.

[25] The quoted phrase is from the instruction for the London policy and is based on the wording in the policy. The General policy used the slightly different phrase "sudden, unexpected, [and] unintentional," and the instruction for the General policy tracks that wording. No party argues that those two phrases have a different legal meaning.

regarding the London exclusion emerged from a conference with the trial court. Allianz objected to London's proposed definition of "sudden" as "short in time or duration, or quick," arguing that it was contrary to *McCormick & Baxter Creosoting*, where this court had interpreted "sudden" in the term "sudden and accidental" not to have a temporal meaning. 324 Or at 214-15. The trial court agreed with plaintiff to that extent and rejected London's proposed definition, but it did not use Allianz's proposed definition. Thus, the instructions to the jury regarding the Domestic exclusion included a definition of "sudden and accidental" as "unexpected and unintended," while the instructions regarding the London exclusion included no definition of "sudden, unintended[,] and unexpected."

The jury returned different verdicts as to the Domestic and London exclusions. In its answer to verdict form question 21, regarding the ACE and Westport policies, the jury found that the "discharge of pollutants that caused" "property damage" was "sudden and accidental" and thus came within the exception set out in the Domestic pollution exclusions in those policies. It found those defendants liable for contribution to Allianz as outlined in the complaint.[26] As to the London and General policies (jury verdict form question 22), however, the jury answered "NO" to the question of whether "the discharge of pollutants that caused any of the property damage [was] sudden, unintended[,] and unexpected." Because the evidence as to the nature of the pollution was the same for all four policies, the jury necessarily found that the alleged pollution did not come within the exception to the London pollution exclusion. Based on that jury verdict, the trial court entered the limited judgment in favor of the London defendants. The verdict in favor of General on the pollution exclusion is reflected in the limited judgment as to the fronting insurers and Con-Way.

On appeal, Allianz assigned error to various trial court rulings regarding the London pollution exclusions. Allianz reprised the arguments outlined above, asserting

_____

[26] The jury verdicts involving the pollution exclusions in the ACE and Westport policies are not part of the limited judgments before us and we express no opinion as to those verdicts.

that the London and Domestic exclusions had the same legal meaning and that the trial court erred in submitting the London exclusions to the jury for interpretation, rather than interpreting them for the jury as a matter of law. Allianz also argued that, because the same evidence was presented as to environmental claims under all the policies, if the jury had been given the same instructions about the meaning of the London exclusion as it had about the Domestic exclusion, it would have reached the same conclusion: that the policies covered the environmental claims. It therefore requests that the jury verdict as to the London exclusion—verdict question 22—be set aside. Allianz further asks, based on the errors at trial, that this court exercise its authority under Article VII (Amended), section 3, of the Oregon Constitution to direct that a judgment be entered in its favor on the London pollution exclusion issue.

Defendants respond that there was no ambiguity in the London exclusion, and so the trial court was not required to interpret the terms of the policy for the jury. Additionally, defendants argue that Article VII (Amended), section 3, does not permit an appellate court to apply the jury's answer to one special verdict question to a different verdict question, as Allianz requests. If the trial court erred, defendants assert, the remedy is to remand to the trial court for further proceedings.

B.  *Merits*

For reasons that we set out below, we conclude that Allianz is correct that the trial court erred in failing to instruct the jury on the meaning of the London pollution exclusion. We also agree with Allianz that, properly interpreted, the term "sudden, unintended[,] and unexpected" in the London policy and the term "sudden, unexpected, [and] unintentional" in the General policy have the same legal meaning that we ascribed to the term "sudden and accidental" in the policies at issue in *McCormick & Baxter Creosoting* and that the jury should have been so instructed. But we reject Allianz's request that this court substitute the jury's verdict in favor of plaintiff on the ACE and Westport policies for the defense verdict that the jury actually reached regarding the London and General policies.

We begin with the issue of whether the trial court erred by failing to instruct the jury as to the meaning of the policy term "sudden, unintended[,] and unexpected." Allianz asserts that that phrase in the London exclusions was ambiguous and that the trial court erred in not determining its meaning as a matter of law and directing the jury to use that meaning in applying the exclusion to the facts. As explained at length above, the interpretation of an insurance contract is a question of law, the goal of which is to ascertain the intent of the parties at the time of contracting. *Hoffman*, 313 Or at 469. If terms in the policy are not defined and there are reasonable, "competing, plausible interpretations," the court must determine what the disputed terms mean, using the principles set out in *Hoffman. Id.* at 470-71. In *McCormick & Baxter Creosoting*, for example, we found the term "sudden and accidental" in an insurance policy's pollution exclusion clause to be ambiguous and proceeded to interpret the term as a matter of law. 324 Or at 215-16. Allianz argues that we should follow the same path here and interpret the admittedly different term in the policies at issue here in the same way.

Defendants do not purport to seek reversal of *McCormick & Baxter Creosoting*, but rather argue that it is distinguishable because the phrase "sudden, unintended[,] and unexpected" is not ambiguous as used in the London and General policies here, and, therefore, the trial court did not err in failing to interpret that term as a matter of law for the jury.

Given our prior decisions, particularly *McCormick & Baxter Creosoting*, defendants' position is untenable. In *McCormick & Baxter Creosoting*, the policy at issue excluded from coverage bodily injury or property damage arising from various enumerated types of pollution, but provided that the "exclusion d[id] not apply if such discharge, dispersal, release, or escape is sudden and accidental." 324 Or at 212 (emphasis and quotation marks excluded). The insurers in *McCormick & Baxter Creosoting* argued that "sudden" had "a temporal meaning, connoting an abruptness and short duration," and "accidental" meant "unintended," but could not be something that occurred over a long period of time as a part of regular business practices. *Id.* at 212-14.

The insured company argued in response that "sudden and accidental" simply meant "unintended and unexpected." *Id.* at 213. Neither "sudden" nor "accidental" was defined in the policy, and on review we noted that both sides offered evidence of their competing interpretations, including case law from other jurisdictions as well as statements by representatives of the insurance industry. *Id.* at 216. We concluded in that instance that the exclusion was ambiguous and that the competing case law and statements from industry representatives "simply help[ed] to demonstrate that the exclusion [was] ambiguous." *Id.*

Defendants assert, however, that because the London exclusion used the words "unexpected and unintended"—rather than "accidental"—together with the word "sudden" in the exception to the pollution exclusion, the ambiguity that this court identified in the *McCormick & Baxter Creosoting* policy does not exist. Rather, they say that the jury could simply be instructed—as it was in this case— to give the contractual terms "their ordinary meaning, unless you decide that the parties * * * intended the words to have another meaning." Defendants' argument appears to rest on the fact that, while the court in *McCormick & Baxter Creosoting* held that "unexpected" was a plausible interpretation of "sudden" in the policy at issue there, "unexpected" is not a plausible interpretation of "sudden" in the London exclusion because the word "unexpected" itself also appears in the exclusion. Defendants argue that to interpret "sudden" as "unexpected" in the London exclusion would be to render the word "sudden" a meaningless redundancy, contrary to one of our principles of insurance contract interpretation referred to in *Hoffman*, 313 Or at 472 ("We assume that parties to an insurance contract do not create meaningless provisions.").

The plain meanings of the policy terms do not provide much clarity. As we explained in *McCormick & Baxter Creosoting*, the word "sudden" may either have or not have a temporal element:

"1a : happening without previous notice or with very brief notice : coming or occurring unexpectedly : not foreseen or prepared for * * * b : changing angle or character all at once : PRECIPITOUS * * * : ABRUPT * * * c : come upon or met with

unexpectedly 2a : characterized by or manifesting hasti-
ness : RASH, HEADLONG."

324 Or at 213 (quoting *Webster's Third New Int'l Dictionary*
2284 (unabridged ed 1993)) (internal quotation marks omit-
ted, alterations in original). In that case, we also looked to
the common meaning of the word "accidental":

> "'2 : occurring sometimes with unfortunate results by
> chance alone : a : UNPREDICTABLE : proceeding from an unrec-
> ognized principle, from an uncommon operation of a known
> principle, or from a deviation from normal.' *Webster's* at 11
> [(1993)].

> "The dictionary goes on to state that, 'when it is used in
> reference to events, ACCIDENTAL may stress lack of intent.'
> *Ibid.* In other words, an accidental event may be an unin-
> tentional, or chance, event."

324 Or at 213-14. Likewise, the words "unexpected" and
"unintended" are defined, respectively, as "not expected
: UNLOOKED-FOR, UNFORESEEN, SURPRISING," *Webster's Third
New Int'l Dictionary* 2494 (unabridged ed 2002), and "not
intended; esp. not deliberate," *Webster's* at 2499 (2002).

Defendants argue that "sudden" as used in the
London exclusion must unambiguously have a temporal
element and mean, essentially, "abrupt," because to read
it otherwise would be to duplicate the term "unexpected."
Allianz argues that the word is ambiguous and could rea-
sonably be interpreted as having a similar meaning to the
words that follow—"unexpected" and "unintended"—as
opposed to having a dissimilar meaning, such as "abrupt."

We agree with defendants that, where a policy con-
tains both the words "sudden" and "unexpected," it would
not make sense to interpret the word "sudden" to mean
"unexpected." The court in *McCormick & Baxter Creosoting*
notably did not conclude that "sudden" can *only* mean "unex-
pected," but rather that the phrase used was ambiguous,
partly because "sudden" might reasonably have several
meanings—in addition to "unexpected"—that lack any
temporal element, such as "unforeseen" and "unprepared
for." 324 Or at 214-16. The holding in *McCormick & Baxter
Creosoting*—that where the phrase claimed to be ambiguous

was "sudden and accidental," "sudden" might reasonably be interpreted to lack a temporal meaning, and be synonymous with "unexpected," "unforeseen," or "unprepared for"—was specific to the policy at issue. But courts do not interpret single words in insurance contracts in isolation; rather, we construe the words in the context of the particular provision and of the policy as a whole. *Hoffman*, 313 Or at 470-71. Although we agree with defendants that "sudden" may not mean "unexpected" where that word appears as part of the same policy term, it is not, in our view, unambiguously clear that "sudden" in that context does *not* mean "unforeseen" or "unprepared for." Put another way, it is not unambiguous from the words used in the policy that "sudden" in this context *must* mean "abrupt," as defendants argue.

As in *McCormick & Baxter Creosoting*, both parties cite case law from other jurisdictions in support of their arguments. *Compare Helena Chemical v. Allianz Underwriters*, 357 SC 631, 641 n 4, 594 SE2d 455, 460 n 4 (2004) (applying the same interpretation to exclusions using the phrases "sudden and accidental" and "sudden, unintended, and unexpected happening"), *and Cotter Corp. v. American Empire Surplus*, 90 P3d 814, 821 (Colo 2004) (noting that previous cases had interpreted both the phrases "sudden and accidental" and "sudden, unintended, and unexpected" in pollution exclusions as meaning "unexpected and unintended"), *with Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal App 4th 715, 753, 15 Cal Rptr 2d 815 (1993) ("If covered pollution has to be 'a sudden, unintended and unexpected happening,' then we must distinguish 'sudden' from 'unexpected' and 'unintended.' That distinction lies in the temporal connotation inherent in the ordinary meaning of 'sudden.'"), *and EDO Corp. v. Newark Ins. Co.*, 878 F Supp 366, 374-75 (D Conn 1995) ("If 'sudden' meant 'unexpected,' * * * then the * * * policies would read, 'unexpected, unintended, and unexpected.' Such a reading would render the word 'sudden' superfluous and * * * [the court] will not subscribe to such an interpretation."). As we noted in *McCormick & Baxter Creosoting*, 324 Or at 215, although it is not conclusive, we do consider differing judicial interpretations of an insurance policy clause as evidence that that clause is ambiguous. *Jones v. Ins. Co. of North America*, 264 Or 276, 282 n 1, 504

P2d 130 (1972) (so stating). *See also* John Alan Appleman and Jean Appleman, 13 *Insurance Law and Practice* § 7404 (1976) ("The very fact that a number of courts have reached conflicting conclusions as to the interpretation of a certain provision is frequently considered evidence of ambiguity.").

We conclude that, like the Domestic exclusion at issue in *McCormick & Baxter Creosoting*, the London exclusion's term "sudden, unintended[,] and unexpected" is susceptible to different interpretations and that the London and General policies in which the term appears do not resolve those ambiguities. The contrast between the way the jury was instructed regarding the Domestic and London exclusions was particularly stark here, where the court gave the jury a definitive legal (and perhaps nonintuitive) definition to apply to the term "sudden and accidental," while giving no specific definition of the term "sudden, unintended[,] and unexpected." That left the jury with only the standard instruction, applicable to all 22 of the special verdicts, that it interpret words according to "their ordinary meaning." Given the ambiguity in that critical wording of the exclusion exception and the requirement that ambiguous terms in insurance policies be interpreted as a matter of law by the court, it was error for the trial court not to interpret the London exclusion for the jury. That part of the verdict and the aspects of the limited judgments based on it must be set aside.

## C.   *Remedy*

Having concluded that the trial court should have interpreted the London exclusion for the jury, we turn to the question of the proper interpretation of that exclusion. As discussed above, London seeks to distinguish this court's interpretation of "sudden and accidental" in *McCormick & Baxter Creosoting*. It argues that the word "sudden" as used in the London exclusion—in contrast to its use in the Domestic exclusion—should be read as including a temporal element because otherwise the word would be redundant of the other words in the term, "unintended" and "unexpected." But our cases do not suggest that the fact that a policy includes words that may be interchangeable or the definitions of which may overlap does not foreclose those definitions. Indeed, the

insurers in *McCormick & Baxter Creosoting* argued that the interpretation eventually adopted by this court was impermissibly redundant, but we rejected that argument. 314 Or at 214. Moreover, the various words used in *McCormick & Baxter Creosoting* to describe what is excepted from the pollution exclusion—"sudden," "accidental," "unintended," and "unexpected"—are the very words included in the London exclusion.

More significantly, London ignores the holdings in *Hoffman* and *McCormick & Baxter Creosoting* that, where a word or phrase in an insurance policy is susceptible to differing plausible interpretations and the ambiguity cannot be resolved by considering the context of the wording and of policy as whole, we construe the ambiguous term in favor of coverage. *Hoffman*, 313 Or at 470-71; *McCormick & Baxter Creosoting*, 324 Or at 216. In *McCormick & Baxter*, this court undertook a similar exercise when it construed the ambiguous term "sudden and accidental" not to include a temporal element and to mean "unintended and unexpected." Because, as we conclude above, the term "sudden, unintended[,] and unexpected" is ambiguous, those cases support Allianz's argument that the term should be construed against the drafter and in favor of coverage.[27] That construction requires a jury instruction similar to that used for the Domestic exclusion.

Finally, we turn to Allianz's argument that the jury's verdict on the Domestic policies can be applied to the London policies as well. London disagrees, taking the position that Article VII (Amended), section 3, of the Oregon Constitution does not permit the court to direct that the jury's verdict on one policy be applied to another policy.

We agree with London that Allianz's requested relief is not appropriate. Allianz cites *Carolina Casualty*

---

[27] London argues for the first time on review that, because Allianz is a "stranger" to the insurance policies, it is not "entitled" to have any ambiguities construed in its favor. We do not foreclose the possibility that in other circumstances it may be appropriate to preclude a nonparty to an insurance policy from benefiting from that rule of construction. In this contribution context, however, we adhere to our longstanding rule that ambiguities in an insurance policy be "construe[d] against the drafter," *McCormick & Baxter Creosoting*, 324 Or at 216, "against the insurer," *Hoffman*, 313 Or at 474, and "in favor of extending coverage * * *." *North Pacific Ins. Co.*, 332 Or at 25.

for the proposition that, "under the Oregon Constitution, Article VII, Section 3, if this court can ascertain with certainty the judgment that should have been entered in the trial court, it is proper for this court to direct it to be entered." 242 Or at 418. Allianz argues that here, too, we can "ascertain with certainty the judgment that should have been entered in the trial court." In *Carolina Casualty*, the court held that the trial court had erred in admitting parol evidence regarding a potential "sham" lease and that, without the introduction of that parol evidence, the written terms of the contract would control and one party would clearly prevail. *Id.* at 417-18. In that sense, the issue in that case was clear-cut: Were it not for the introduction of the parol evidence, the issue could be resolved as a matter of law from the face of the contract and, therefore, Article VII (Amended), section 3, permitted this court to enter the correct judgment.

Given the complicated factual circumstances and the procedural posture of this case—including that we are remanding the "side agreement" issue to the trial court for decision—we conclude that it is not appropriate for this court to step into the shoes of the jury. Rather, we conclude that the proper resolution is to remand the pollution exclusion issue to the trial court with instructions to give the jury a similar instruction regarding the term "sudden, unintended[,] and unexpected" in the London exclusion as it did regarding the term "sudden and accidental" in the Domestic exclusion.[28]

## V.   CONCLUSION

In summary, we reverse the Court of Appeals' holding that Daimler did not assume the contingent liabilities of Freightliner—including the liabilities at issue here—and affirm the jury verdict on that issue. On Allianz's appeal, we agree that the trial court erred in submitting to the jury the question of whether, because of the side agreements between Con-Way/Freightliner and the insurers, those insurers

---

[28] This holding is limited to the issue before us regarding the interpretation and jury instructions as to the portions of the London pollution exclusion that we discuss. We express no opinion as to the meaning of other provisions in the London and General policies.

had a "duty to defend or indemnify Freightliner." In this inter-insurer contribution case, that question is to be decided by the trial court as a matter of law based on the relevant policies. Finally, as to the London pollution exclusion, we agree with Allianz that it was error for the trial court not to provide a legal interpretation of a key provision in the policy as part of the jury instructions. We also conclude that the jury instructions regarding the London pollution exclusion should be similar to those regarding the Domestic exclusion.

The decision of the Court of Appeals is reversed. The limited judgments of the trial court are affirmed in part and reversed in part, and the case is remanded to the trial court for further proceedings.